STATE OF NORTH CAROLINA v. GARY LOUIS MEADOWS

No. COA02-734

(Filed 17 June 2003)

### 1. Witnesses— five-year-old boy—competent

The trial court did not abuse its discretion by finding a five-year-old boy competent to testify about the shooting of his mother and her boyfriend when he was three years old. The sole test for competency is the requirement that the witness be capable of expressing himself and understanding his duty to testify truthfully. Despite defendant's assertions regarding particular statements made by the boy, it cannot be said that the court's determination could not have been the result of a reasoned decision.

### 2. Evidence— hearsay—present sense impression—emotional content necessary

A murder victim's statements regarding her relationship with a defendant are often admitted into evidence pursuant to N.C.G.S. § 8C-1, Rule 803(3) as a present sense impression. Statements which merely recite facts without revealing emotion are not admissible, but statements of fact providing a context for expressions of emotion are admissible.

**3. Evidence— murder victim—statements about defendant— state of mind—factual context**

A murder victim's statements to a witness about her ex-boyfriend were admissible under the state-of-mind exception to the hearsay rule where the victim showed the witness a picture of defendant and said she was afraid of him, that he was crazy and abusive and had burned her with an iron, and that she was sick and tired of the abuse and wanted to get away. The witness plainly linked the contextual facts to the victim's statements of her emotions and state of mind.

**4. Evidence— murder victim—statements about defendant— state of mind—factual context**

A murder victim's statements about defendant to a second witness were admissible under the state-of-mind exception to the hearsay rule even though the witness did not interject the victim's statements of emotion into every factual statement. The witness plainly testified to the victim's emotions and related those emotions to the precipitating actions.

**5. Homicide— first-degree murder—instructions—manslaughter charge not given**

Any error in not instructing a jury on voluntary and involuntary manslaughter in a first-degree murder trial was harmless where the court submitted first-degree murder based on premeditation and deliberation, felony murder, lying in wait, second-degree murder, and not guilty, and the jury found defendant guilty of first-degree murder based on premeditation and deliberation and felony murder.

**6. Homicide— self-defense—claim of accident**

Defendant was not entitled to a self-defense instruction for a shooting that he contended was accidental.

**7. Homicide— self-defense—belief in necessity of shooting**

The trial court did not err by not instructing on self-defense in an attempted murder trial where defendant's belief that the shooting was necessary to save himself was not objectively reasonable.

**8. Homicide— first-degree murder—short-form—indictment**

The short-form indictment for first-degree murder is constitutional.

STATE v. MEADOWS

[158 N.C. App. 390 (2003)]

Appeal by defendant from judgments entered 17 August 2001 by Judge Forrest D. Bridges in Mecklenburg County Superior Court. Heard in the Court of Appeals 12 March 2003.

*Attorney General Roy Cooper, by Assistant Attorney General Buren R. Shields, III, for the State.*

*Everett & Hite, L.L.P., by Kimberly A. Swank, for defendant-appellant.*

CALABRIA, Judge.

Gary Louis Meadows ("defendant") appeals convictions for the first-degree murder of his former girlfriend, Latonya Michelle Davis ("Davis"), and the attempted first-degree murder of William Todd Burgess ("Burgess"), Davis' neighbor and new boyfriend. The evidence tended to show Davis and defendant were involved in an intimate relationship between 1996 and 1999. Although Davis lived at home with her parents, defendant served as the father figure to Davis' son,[1] Daveon. There was evidence of domestic violence in Davis and defendant's relationship. It is undisputed that on 15 June 1999, Burgess took Davis out to dinner to celebrate her twenty-first birthday. When they arrived home, defendant was waiting for them.

Burgess testified to the events of 15 June 1999. According to Burgess, he and Davis dropped Daveon off at the home of Davis' brother and then stopped by Burgess' office to pick up some paperwork on their way to the restaurant. After the date, Davis and Burgess picked up Daveon. Davis then dropped Burgess off in the street in front of Burgess' house and continued into her driveway. Burgess returned to Davis' house because he had forgotten the paperwork in Davis' car. While Burgess was in Davis' yard, defendant approached him, from behind and to his right, mumbling "negative words." As Burgess turned towards defendant and realized he was within five feet of him, defendant shot him. Burgess then explained, "I seen [Davis] trying to get out of the way, and she was screaming. And when she was trying to get out of the way, the suspect went to her and shot her. And then I heard [Daveon] crying and telling his mother to try to wake up[.]" Burgess fled the scene.

---

1. Daveon was Davis' son from a previous relationship. Daveon was four months old when Davis and defendant began dating and was three years old when his mother was killed.

Defendant testified on his own behalf as to the events of 15 June 1999. According to defendant, at approximately 11 p.m., he went to Davis' home to give her a birthday present. When defendant arrived, since Davis was not home, he waited on the porch. After Davis pulled into the driveway, Daveon went up on the porch where he and defendant greeted one another. Burgess came across the yard and began kissing, hugging and grabbing Davis. Defendant testified he stepped off the porch and saw Burgess move as though he was pulling a gun or a knife from his crotch area. Defendant saw the item shine, and believed he needed to shoot Burgess to save himself. Defendant "fired one shot at Mr. Burgess, and then he fell back and I started to run. I stepped in the grass because it had been raining, and I still had my hand on the trigger, and I slipped in the grass and, I mean, I felt like my gun fired a second shot. I wasn't sure and I took off running." Although defendant knew he hit Burgess, he did not think Davis had been shot.

Defendant was subsequently arrested, indicted, tried by a jury, and convicted of the first-degree murder of Davis and the attempted first-degree murder of Burgess. Defendant was sentenced to consecutive terms of 180 months to 225 months for the first-degree attempted murder of Burgess and life imprisonment without the possibility of parole for the first-degree murder of Davis.

Defendant appeals asserting the trial court erred by: (I) permitting Daveon to testify; (II) admitting evidence of Davis' prior statements regarding her relationship with defendant; (III) refusing to instruct the jury on voluntary and involuntary manslaughter; (IV) refusing to instruct the jury on self-defense; and (V) allowing use of the short-form indictment.

I. Daveon Davis' Testimony

[1] Defendant appeals asserting the trial court abused its discretion by finding Daveon, who was three years old when he witnessed his mother and Burgess being shot and five years old at the time of trial, was competent to testify.[2]

North Carolina law provides: "[e]very person is competent to be a witness except . . . when the court determines that he is (1) incapable of expressing himself . . . or (2) incapable of understanding

---

2. We note, " '[t]here is no age below which one is incompetent, as a matter of law, to testify.' " *State v. Ward*, 118 N.C. App. 389, 394, 455 S.E.2d 666, 668 (1995) (quoting *State v. Jenkins*, 83 N.C. App. 616, 621, 351 S.E.2d 299, 302 (1986)).

the duty of a witness to tell the truth." N.C. Gen. Stat. § 8C-1, Rule 601 (2001). "The competency of a witness is a matter which rests in the sound discretion of the trial judge. 'Absent a showing that the ruling as to competency could not have been the result of a reasoned decision, the ruling must stand on appeal.' " *State v. Ford*, 136 N.C. App. 634, 639, 525 S.E.2d 218, 221-22 (2000) (quoting *State v. Hicks*, 319 N.C. 84, 89, 352 S.E.2d 424, 426 (1987)) (internal citation omitted). "When exercising its discretion, the trial court 'must rely on [its] personal observation of the child's demeanor and responses to inquiry on *voir dire* examination.' " *State v. Andrews*, 131 N.C. App. 370, 373-74, 507 S.E.2d 305, 308 (1998) (quoting *State v. Fearing*, 315 N.C. 167, 174, 337 S.E.2d 551, 555 (1985)).

Defendant asserts the trial court judge abused his discretion in determining Daveon understood his duty to tell the truth. We disagree. During *voir dire*, Daveon testified on direct examination:

Q: Can you tell us where you are?

A: Court.

Q: Okay. And do you know what you're here to talk about?

A: Telling the truth.

Q: Okay. Do you know about telling the truth and telling lies?

A: (Nodding head.)

Q: Can you tell us if telling the truth is good or bad?

A: Bad—good—I mean bad.

Q: Okay. How about telling a lie, is that good or bad?

A: Bad, not good.

Q: And what happens, Daveon, if you tell a lie?

A: You go get in trouble.

Q: Okay. And let me ask you, do you know what telling the truth and what telling a lie means?

A: (Nodding head.)

Q: You're nodding your head yes. Could you say 'yes' for us instead of nodding?

A: Yes, ma'am.

**STATE v. MEADOWS**

[158 N.C. App. 390 (2003)]

Q: Okay. Let me ask you a question. Could you look at your pants for me and tell me what color they are?

A: Black.

Q: Okay. And if you told me right now that your pants were white, would that be telling the truth or telling a lie?

A: Telling a lie.

Q: Okay. If you were going to testify in this case and testify in front of a jury, can you promise everyone in this courtroom that you're going to tell the truth?

A: (Nodding head.)

Daveon was later examined by the court, and the following exchange occurred:

Q: Now, you know the difference between telling a lie and telling the truth?

A: (Nodding head).

Q: You do?

A: (Nodding head). A lie is not what you have to do. Telling the truth is what you do.

. . .

Q: Let's make a deal. If somebody asks you a question and you don't know the answer to it, I want you to say, 'I don't know.' Can you do that?

A: (Nodding head).

Q: All right. So, if she [the prosecutor] asks you a question and she asks you—What's my name? You don't know my name, do you? Do you know my name?

A: No.

Q: So if she asks—

A: Never been seeing you.

Q: Yeah. You've never seen me before. You're not supposed to know my name, are you?

A: I never been seeing you.

Q: So if she [the prosecutor] asks you a question—if she asks you what my name is, what are you going to say to her?

A: That I don't know.

Q: That's right. I don't know. And that's telling the truth, because you don't know, isn't it?

A: Uh-huh (affirmative).

Q: Okay. You promise me that you'll do that?

A: (Nodding head).

These exchanges demonstrate Daveon was capable of expressing himself, understood the difference between the truth and a lie and knew to tell the truth, as required for competency by N.C. Gen. Stat. § 8C-1, Rule 601.

Defendant asserts Daveon was nevertheless an incompetent witness because he testified that telling the truth was "bad." We note, Daveon later demonstrated his understanding that "[t]elling the truth is what you do" and promised to only tell the truth. Considering the entire transcript, we cannot find the trial court abused its discretion by not finding Daveon incompetent based upon his singular statement that telling the truth was "bad." *See Andrews*, 131 N.C. App. at 374, 507 S.E.2d at 308 (holding a five year old competent to testify regarding her mother's murder despite having said it was not good to tell the truth since she later explained it was wrong to lie, she would get spanked for lying, it would be a lie to say her blue dress was red, and she wanted to tell the truth about her mother's killing.)

Defendant asserts a number of additional reasons why Daveon was not a competent witness. First, Daveon stated he lives with "[m]y grandaddy, my grannie and my mommy." However, Daveon explained he calls his grandmother both "grannie" and "mommy" because "my other mama [is] gone." Second, Daveon often nodded his head instead of responding audibly. Since a witness need only be capable of expressing himself, we cannot find Daveon's silent expression improper. Third, Daveon stated his mother died only one minute earlier. The transcript reveals Daveon's confusion, and it appears Daveon was attempting to testify the shooting took one minute.[3]

---

3. On cross examination, after asking Daveon to recite the alphabet, the following exchange occurred:

Q: Very good. Very good. Do you remember how long ago—

A: (Nodding head.)

Fourth, Daveon did not know Burgess' name. Considering Burgess has never been a part of Daveon's life, his inability to recall Burgess' name does not support the conclusion the trial court abused its discretion by permitting Daveon's testimony. Rather, this instance demonstrates that Daveon understood his role, as he responded precisely as he promised Judge Bridges and stated he did not know the other man's name. We do not find any of these assertions by defendant support the conclusion the trial court abused its discretion by finding Daveon competent to testify.

Finally, defendant asserts Daveon was incompetent to testify because he could not distinguish between what he saw and what he was told. On *voir dire* while conversing with the court, Daveon explained he was ready to tell the court what he saw, saying "I could tell it. I could tell all about it." He explained no one had told him about it but rather, "I just knew it. I just saw it." Daveon elaborated:

A: I saw Gary shot my mommy. Shot the other guy and then—no. First thing when all—when we just came—when me and my mommy just came back from our house—from somewhere else, I think that Gary was sitting in there already, because I saw—because I knew Gary was in there. And I told myself, I know Gary not in that house. So I went in there and then when I was about to close the door, I saw Gary and he told me to be quiet or something.

Q: But nobody has told you that?

A: Huh-uh (negative).

Q: You saw all that yourself?

A: Uh-huh (affirmative).

Daveon then explained: "Gary went over by Oscar, yelling at the dog, and he climb up the fence and he ran over his car, trying

Q: —what happened to your mother happened?

A: (Nodding head.)

Q: How long ago was it?

A: Huh?

Q: How long ago was it that things happened to your mother?

A: Just one minute. Just—Gary just shot just two people and then that was when he just shot two people.

Q: And that was just one minute?

A: (Nodding head).

to wake—trying to—trying to go back home but the police found him . . . and put him in jail." While it is apparent Daveon did not see the police find the defendant and put him in jail, we do not agree that Daveon's testimony regarding this at *voir dire* necessitated the trial court finding him incompetent to testify. Although witnesses may not testify regarding information not within their personal knowledge, the proper recourse is objecting to this evidence at trial, striking that testimony, and not preventing the witness' testimony entirely as incompetent. The sole test for competency is set forth in N.C. Gen. Stat. § 8C-1, Rule 601, requiring the witness be capable of expressing himself and understand his duty is to testify truthfully. Applying this test and examining this record, we cannot conclude the trial court's determination that Daveon was competent to testify "could not have been the result of a reasoned decision." Accordingly, we affirm the trial court's determination that Daveon was competent to testify.

II. Victim's Prior Statements

**[2]** Defendant asserts the trial court erred by allowing Burgess and the victim's cousin Glenda Davis ("Glenda") to testify as to statements Davis made to each witness regarding her relationship with defendant. The trial court permitted the testimony as present sense impressions pursuant to N.C. Gen. Stat. § 8C-1, Rule 803(3) (2001).

Generally, a statement made by a declarant other than the witness testifying is hearsay and is not admissible at trial to prove the truth of the matter asserted. N.C. Gen. Stat. §§ 801(c), 802 (2001). However, such testimony is admissible if it regards "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition . . . but not including a statement of memory or belief to prove the fact remembered or believed . . . ." N.C. Gen. Stat. § 803(3) (2001). A murder victim's statements regarding her relationship with defendant are often admitted into evidence pursuant to Rule 803(3). *State v. Carroll*, 356 N.C. 526, 542, —— S.E.2d. ——, —— (12-20-2002); *State v. McHone*, 334 N.C. 627, 637, 435 S.E.2d 296, 301-02 (1993).

In applying Rule 803(3), our Supreme Court has explained that statements which "are merely a recitation of facts which describe various events" and are totally without emotion are not admissible pursuant to this hearsay exception. *State v. Hardy*, 339 N.C. 207, 228, 451 S.E.2d 600, 612 (1994). However, "[t]he Court later clarified that statements of fact providing context for expressions of emotion are admissible under *Hardy*." *State v. Marecek*, 152 N.C. App. 479, 498, 568 S.E.2d 237, 250 (2002) (citing *State v. Gray*, 347 N.C. 143, 173, 491

S.E.2d 538, 550 (1997)). Where the statements reveal " 'the victim's state of mind or contain statements of the victim's fear of defendant' " the statements are distinguishable from those in *Hardy* because the *Hardy* statements only " 'contained descriptions of assaults and threats against the victim' " and revealed no emotion. *State v. Kimble*, 140 N.C. App. 153, 164, 535 S.E.2d 882, 890 (2000) (quoting *State v. Wilds*, 133 N.C. App. 195, 205, 515 S.E.2d 466, 475 (1999)).

[3] First, we address Burgess' testimony. Burgess testified that on the day of the shootings, Davis showed him a picture of defendant and told him defendant was "her ex-crazy boyfriend" who "burned her with an iron, [was] very abusive, physical[ly]" and she was "scared to death of him." Burgess elaborated Davis told him "she was sick and tired of the abuse" and "she want[ed] to get away. . . ." Burgess' testimony plainly linked the contextual facts to Davis' statements of her emotions and state of mind. We find the trial court did not err in permitting his testimony pursuant to Rule 803(3).

[4] Next, we address Glenda's testimony. Glenda stated she personally witnessed defendant stalk and abuse Davis. Glenda explained that Davis shared with Glenda her feelings and emotions regarding her relationship with defendant. Glenda testified Davis told her on numerous occasions that defendant beat her and "she was very scared, she was frightened, she was very upset" by defendant's actions towards her. Glenda testified Davis "said she had met someone new that she really liked a lot, and that she wanted to break if [(sic)] off with [defendant] . . . but she was scared." Glenda elaborated, "[s]he said she was scared [defendant] would kill her if he found out she was seeing someone else." Defendant asserts since Glenda testified without interjecting Davis' statements of emotions into every factual statement, the rule in *Hardy* requires that only those statements linked to emotion be admitted pursuant to Rule 803(3). We disagree. Glenda plainly testified as to Davis' emotions and related those emotions to the precipitating actions. We conclude this testimony sufficiently expressed Davis' emotional state and the appropriate statements of fact which supplied context to her emotions. The trial court properly admitted this evidence pursuant to Rule 803(3) and in accordance with North Carolina case law.

III. Jury Instructions on Manslaughter

[5] Defendant asserts the trial court erred by failing to instruct the jury on the lesser included offenses of voluntary and involuntary

manslaughter for the charge of first-degree murder. While "[a] defendant is entitled to have the jury consider all lesser included offenses supported by the indictment and raised by the evidence" we need not address whether the trial court erred in not submitting voluntary and involuntary manslaughter to the jury in the case at bar since any conceivable error was harmless. *State v. Price,* 344 N.C. 583, 589, 476 S.E.2d 317, 320 (1996). The North Carolina Supreme Court "has adopted the rule that when the trial court submits to the jury the possible verdicts of first-degree murder based on premeditation and deliberation, second-degree murder, and not guilty, a verdict of first-degree murder based on premeditation and deliberation renders harmless the trial court's improper failure to submit voluntary or involuntary manslaughter." *Id.,* 344 N.C. at 590, 476 S.E.2d at 321. Here, since the trial court submitted to the jury possible verdicts of first-degree murder based on premeditation and deliberation, felony murder, and lying in wait, second-degree murder, and not guilty, and the jury found defendant guilty of the first-degree murder of Davis based on both premeditation and deliberation and felony murder, any possible error would be harmless.

IV. Instruction on Self-Defense

Defendant asserts the trial court erred by not instructing the jury on self-defense.

**[6]** Defendant's claim of self-defense applies only to the charge of attempted murder of Burgess and not for the charge of murder of Davis. " '[D]efendant is not entitled to an instruction on self-defense while still insisting that he did not fire the pistol at [the victim], that he did not intend to shoot [the victim] and that he did not [know [the victim] had been shot].' " *State v. Nicholson,* 355 N.C. 1, 30, 558 S.E.2d 109, 130, *cert. denied,* —— U.S. ——, 154 L. Ed. 2d 71 (2002) (quoting *State v. Williams,* 342 N.C. 869, 873, 467 S.E.2d 392, 394 (1996)). Since here, defendant testified he did not fire the gun at Davis, did not intend to shoot Davis, and did not know she had been shot until later, defendant would not be entitled to an instruction on self-defense for the murder of Davis. Defendant claimed the shooting of Davis was accidental and occurred while he slipped in the wet grass as he ran away from her home. The trial court instructed the jury on accident. Accordingly, we address the claim of self-defense only in relation to the charge of attempted murder.

**[7]** "A defendant is entitled to a jury instruction on self-defense when there is evidence from which the jury could infer that he acted in self-

defense." *State v. Allred*, 129 N.C. App. 232, 235, 498 S.E.2d 204, 206 (1998). There are two types of self-defense, perfect self-defense, which consists of the following four elements, and imperfect self-defense, which consists of only the first two elements:

(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at that time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Lyons*, 340 N.C. 646, 661, 459 S.E.2d 770, 778 (1995) (quoting *State v. McAvoy*, 331 N.C. 583, 595, 417 S.E.2d 489, 497 (1992) (quoting *State v. Norris*, 303 N.C. 526, 530, 279 S.E.2d 570, 572-73 (1981))).

Therefore, for defendant to be entitled to an instruction on self-defense, the following questions must be answered affirmatively: " '(1) Is there evidence that the defendant in fact formed a belief that it was necessary to kill his adversary in order to protect himself from death or great bodily harm, and (2) if so, was that belief reasonable?' " *Lyons*, 340 N.C. at 662, 459 S.E.2d 778 (quoting *State v. Bush*, 307 N.C. 152, 160, 297 S.E.2d 563, 569 (1982)). "In determining whether the self-defense instruction should have been given, 'the facts are to be interpreted in the light most favorable to [the] defendant.' " *State v. Moore*, 111 N.C. App. 649, 654, 432 S.E.2d 887, 889 (1993) (quoting *State v. Watkins*, 283 N.C. 504, 509, 196 S.E.2d 750, 754 (1973)).

Taking the evidence in the light most favorable to defendant, we hold the trial court properly declined to instruct the jury on self-defense because defendant's belief was not objectively reasonable. The uncontroverted evidence is that just prior to midnight on 15 June 1999, defendant was waiting on Davis' unlit porch. He had his gun out and a bullet was in the chamber. When Davis was greeted in the yard

by her date, defendant stepped past Daveon and off the porch. He held the gun in his hand. He approached the couple from behind Burgess mumbling "negative words." As he approached the couple, Burgess "pulling from his crotch area" and defendant "saw something shine." When defendant was close enough to Burgess that they could have touched each other without fully extending their arms, he shot Burgess in the face. Burgess fell immediately and both Burgess and defendant thought he was dead. Defendant testified he believed Burgess had a weapon and it was necessary for him to shoot Burgess to save himself. However, taking this evidence in the light most favorable to defendant, despite defendant's testimony, we find defendant's belief was not objectively reasonable.

Our Supreme Court held that where the record was "totally void of any evidence" supporting "defendant's self-serving claim" that he believed the other person was reaching for a weapon, the Court may hold defendant's belief was not objectively reasonable and that the trial court properly refused to instruct the jury on self-defense. *State v. Williams*, 342 N.C. 869, 873-74, 467 S.E.2d 392, 394 (1996). Accordingly, under the facts of this case, we hold the trial court did not err in failing to instruct the jury on self-defense.

V. Short Form Indictment

[8] Defendant asserts, for preservation of the issue, the short-form indictment utilized in the murder charge was fatally defective because "it failed to allege the essential elements of first-degree premeditated and deliberated murder or first-degree felony murder." However, defendant acknowledged the North Carolina Supreme Court has upheld the constitutionality of the short-form murder indictment. *State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. Wallace*, 351 N.C. 481, 528 S.E.2d 326, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000), *reh'g denied*, 531 U.S. 1120, 148 L. Ed. 2d 784 (2001). Thus, we hold accordingly.

No error.

Judges McCULLOUGH and TYSON concur.